1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| SATYANARAYANA KANUGONDA, Individually and On Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| vs. | |
| FUNKO, INC., BRIAN MARIOTTI, RUSSELL NICKEL, KEN BROTMAN, GINO DELLOMO, CHARLES DENSON, DIANE IRVINE, ADAM KRIGER, RICHARD MCNALLY, GOLDMAN SACHS & CO., J.P. MORGAN SECURITIES LLC, MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, PIPER JAFFRAY & CO., JEFFERIES LLC; STIFEL, NICOLAUS & COMPANY, INCORPORATED, BMO CAPITAL MARKETS CORP., and SUNTRUST ROBINSON HUMPHREY, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Satyanarayana Kanugonda ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants'

HALL & GEORGE PLLC
1001 Fourth Avenue, Suite 3900, Seattle, WA 98154  206.292.5900

public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Funko, Inc. ("Funko" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a federal securities action on behalf of a class consisting of all persons who purchased or otherwise acquired Funko securities pursuant to its initial public offering and/or traceable to the Company's initial public offering commenced on or around November 1, 2017 (the "IPO" or the "Offering") seeking to recover damages caused by Defendants' violations of Sections 11, 12 and 15 of the Securities Act of 1933 ("Securities Act").

2.     Funko is a pop culture consumer products company which sells, among other things, bobble heads and action figures.

3.     The claims in this action arise from the materially misleading Registration Statement and Prospectus (defined infra) issued in connection with the Offering. In the IPO, the Company sold 10,416,666 shares of Class A common stock at a price to the public of $12.00 per share. According to the Company, it received net proceeds of approximately $116.4 million after deducting underwriting discounts and commissions.

4.     The Registration Statement contained untrue statements of material fact and omitted to state material facts necessary to make statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents. Specifically, the Registration Statement failed to disclose that: (1) Funko's profits and growth were not as positive as the Company represented; (2) Funko's business model and customer base had not insulated it from adverse industry, sales, and earnings trends; (3) as a result, Defendants' statements in the Registration Statement regarding Funko's business, operations and prospects were materially false and/or misleading.

5.      On December 21, 2017, the price of Funko's Class A common stock closed at $6.00 per share, or 50% below the Company's $12 IPO price. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under and pursuant to §§11, 12 and 15 of the Securities Act (15 U.S.C. §§77k, 77l and 77o).

7.      This Court has jurisdiction over this action pursuant to §22 of the Securities Act (15 U.S.C. §77v) and 28 U.S.C. §1331.

8.      Venue is properly laid in this District pursuant to §22 of the Securities Act and 28 U.S.C. §1391(b) as the Company has principal executive offices in and conducts business in this Judicial District.

9.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

10.      Plaintiff, as set forth in the attached Certification (attached as Exhibit 1), incorporated herein by reference, acquired and held shares of the Company at artificially inflated prices pursuant and/or traceable to the Company's IPO and has been damaged by the revelation of the Company's material misrepresentations and material omissions.

11.      Defendant Funko is a Delaware corporation with principal executive offices located at 2802 Wetmore Avenue, Everett, Washington 98201. Funko's common stock trades on the NASDAQ under the ticker symbol "FNKO."

12.      Defendant Brian Mariotti ("Mariotti") was the Company's Chief Executive Officer ("CEO") and a Director of Funko at the time of the IPO.

13.      Defendant Russell Nickel ("Nickel") was, at all relevant times, the Company's Chief Financial Officer ("CFO").

14.     Defendant Ken Brotman ("Brotman") was, at all relevant times, a director of Funko.

15.     Defendant Gino Dellomo ("Dellomo") was, at all relevant times, a director of Funko.

16.     Defendant Charles Denson ("Denson") was, at all relevant times, a director of Funko.

17.     Defendant Diane Irvine ("Irvine") was, at all relevant times, a director of Funko.

18.     Defendant Adam Kriger ("Kriger") was, at all relevant times, a director of Funko.

19.     Defendant Richard McNally ("McNally") was, at all relevant times, a director of Funko.

20.     Defendants named above in ¶¶12-19 are referred to herein as the "Individual Defendants."

21.     Defendant Goldman Sachs & Co. ("Goldman") served as an underwriter for the IPO.

22.     Defendant J.P. Morgan Securities LLC ("JPM") served as an underwriter for the IPO.

23.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") served as an underwriter for the IPO.

24.     Defendant Piper Jaffray & Co. ("Piper Jaffray") served as an underwriter for the IPO.

25.     Defendant Jefferies LLC ("Jefferies") served as an underwriter for the IPO.

26.     Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") served as an underwriter for the IPO.

27.     Defendant BMO Capital Markets Corp. ("BMO") served as an underwriter for the IPO.

28.     Defendant SunTrust Robinson Humphrey, Inc. ("SunTrust") served as an underwriter for the IPO.

29.     Defendants named above in ¶¶21-28 are referred to herein as the "Underwriter Defendants."

30.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

### SUBSTANTIVE ALLEGATIONS

31.     Pursuant to the Securities Act, Defendants are strictly liable for material misstatements in the Registration Statement and Prospectus, issued in connection with the IPO. The Securities Act claims specifically exclude any allegations of fraud, knowledge, recklessness or scienter, do not "sound in fraud" and are based solely on strict liability and negligence.

### Background

32.     Defendant Funko is a consumer products company. It develops licensing relationships with content providers and creates figurines and products based on pop culture references. The Company's most familiar products are its Pop! Collectibles—dolls based on popular culture characters and icons.

### Materially False and Misleading Statements Issued During the Class Period

33.     On or around October 6, 2017, the Company filed with the SEC a registration statement on Form S-1 for the IPO, which was declared effective on November 1, 2017 (together with all amendments, the "Registration Statement"). The next day, the Company filed a free writing prospectus for the IPO on Form FWP. On November 3, 2017, Funko filed the prospectus for the IPO on Form 424B4 (the "Prospectus"), which incorporated and formed part of the Registration Statement. Together, the Registration Statement and Prospectus were used to sell to the investing public approximately 10.4 million shares of Funko Class A common stock in the IPO at $12 per share.

34.     The Registration Statement was signed by the Individual Defendants.

35.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements

contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.

36.     Specifically, the Registration Statement discussed the Company's "strong growth[,]" stating in relevant part:

> Our financial performance reflects the strong growth of our business. From 2014 to 2016, we expanded our net sales, net income and Adjusted EBITDA at a 100%, a 17% and an 86% compound annual growth rate, or CAGR, respectively. We achieved this growth without reliance on a singular "hit" property as no single property accounted for more than 15% of annual net sales during that period. We believe our strong growth and profitability reflect our pop culture consumer products leadership.



37.     The Registration Statement also represented that Funko had significant intangible assets, as reflected in the following chart (in thousands):

|  | December 31, 2016 | | |
| --- | --- | --- | --- |
|  | Gross Carrying Amount | Accumulated Amortization | Intangible Assets, Net |
| Intangible assets subject to amortization |  |  |  |
| Intellectual property | $ 114,411 | $ (6,674) | $107,737 |
| Trade names | 81,358 | (4,746) | 76,612 |
| Customer relationships | 63,129 | (3,682) | 59,447 |
| Balance as of December 31, 2016 | $258,898 | $ (15,102) | $243,796 |

|  | December 31, 2015 | | |
| --- | --- | --- | --- |
|  | Gross Carrying Amount | Accumulated Amortization | Intangible Assets, Net |
| Intangible assets subject to amortization |  |  |  |
| Intellectual property | $ 114,411 | $ (953) | $113,458 |
| Trade names | 81,358 | (678) | 80,680 |
| Customer relationships | 63,129 | (526) | 62,603 |
| Balance as of December 31, 2015 | $258,898 | $ (2,157) | $256,741 |

For the year ended December 31, 2016, the Successor 2015 Period, and the Predecessor 2015 Period, amortization of intangible assets was $12.9 million, $2.2 million, and $1.4 million, respectively. Estimated amortization expense will be $12.9 million for each of the next five years.

There was no impairment of goodwill and intangible assets for the year ended December 31, 2016 or for the Successor 2015 Period and the Predecessor 2015 Period.

38.     Additionally, the Registration Statement represented that the Company's diverse portfolio and unique production and design model insulated it from adverse trends in the toy and retail industry, stating in relevant part:

> ***Content Providers***: We have strong licensing relationships with many established content providers, such as Disney, HBO, LucasFilm, Marvel, the National Football League and Warner Brothers. We strive to license every pop culture property that we believe is relevant to consumers. ***We currently have licensed over 1,000 properties, which we believe represents one of the largest portfolios in our industry, and from which we can create multiple products based on each character within those properties.*** Content providers trust us to create unique, stylized extensions of their intellectual property that extend the relevance of their content with consumers through ongoing engagement, helping to maximize the lifetime value of their content. We believe we have benefited from a trend of content providers consolidating their relationships to do more business with fewer licensees. ***Our track record of obtaining licenses from content providers, together with our proven ability to renew and extend the scope of our licenses, demonstrates the trust content providers place in us***.
>
> * * *
>
> We have developed a nimble and low-fixed cost production model. The strength of our in-house creative team and relationships with content providers, retailers and third-party manufacturers allows us to move from product concept to pre-selling a new product in as few as 24 hours. We typically have a new figure on the store shelf between 110 and 200 days and can have it on the shelf in as few as 70 days. ***As a result, we can dynamically manage our business to balance current content releases and pop culture trends with content based on classic evergreen properties, such as Mickey Mouse or classic Batman. This has allowed us to deliver significant growth while lessening our dependence on individual content releases***.

(Emphasis added.)

39.     The Registration Statement stated that the Company's diversification drove "revenue visibility and growth" while "lessening [its] dependence on individual content releases," stating in relevant part:

**Dynamic Business Model Drives Revenue Visibility and Growth**

Our business is diversified across content providers and properties, product categories, and sales channels. As a result, ***we can dynamically manage our business to capitalize on pop culture trends, which has allowed us to deliver significant growth while lessening our dependence on individual content releases***. Our content provider relationships are highly diversified. We generated only approximately 8% and 15% of net sales from our top property for the six

months ended June 30, 2017 and the year ended December 31, 2016, respectively, and the portion of our net sales for the six months ended June 30, 2017 and the year ended December 31, 2016 attributable to our top five properties was 27% and 36%, respectively. Our products are balanced across our licensed property categories. In 2016, we generated approximately 43% of net sales from classic evergreen properties, approximately 24% from movie release properties, approximately 20% from current video game properties and approximately 12% from current TV properties. We have visibility into the new release schedule of our content providers and our expansive license portfolio allows us to dynamically manage new product creation. This allows us to adjust the mix of products based on classic evergreen properties and new releases, depending on the media release cycle. In addition, we sell our products worldwide through a diverse group of sales channels, including specialty retailers, distributors, mass-market retailers, e-commerce sites and direct-to-consumer.

(Emphasis added.)

40.    The Registration Statement stated that Funko's "passionate" customer base drove growth and would continue to do so:

With our unique style, expertise in pop culture, broad product distribution and highly accessible price points, ***we have developed a passionate following for our products that has underpinned our growth.*** We believe we sit at the nexus of pop culture – content providers value us for our broad network of retail customers, retailers value us for our broad portfolio of licensed pop culture products and pop culture insights, and consumers value us for our distinct, stylized products and the content they represent. We believe our innovative product design and market positioning have disrupted the licensed product markets and helped to define today's pop culture products category.

* * *

***We believe we drive meaningful traffic to our retail customers' stores because our products have their own built-in fan base, are refreshed regularly creating a "treasure hunt" shopping experience for consumers, and are often supplemented with exclusive, limited-time products that are highlighted on social media. We believe these merchandising strategies create a sense of urgency with consumers that encourages repeat visits to our retail customers. . . .***

. . . ***Our products are generally priced under $10, which allows our diverse consumer base to express their fandom frequently and impulsively***. We continue to introduce innovative products designed to facilitate fan engagement at different price points and styles. In addition, our fans routinely express their passion for our products and brands through social media and live pop culture events, such as Comic-Con or Star Wars Celebration.

(Emphasis added).

41.    The Registration Statement also listed the Company's strategies, which Funko

"believe[d] w[ould] drive substantial future growth," including: (1) "Increase Sales with Existing Retail Customers"; (2) "Add New Retail Customers and Expand Into New Channels"; (3) "Broaden Our Product Offerings"; (4) "Expand Internationally"; and (5) "Leverage the Funko Brand Across Multiple Channels."

42.    The statements referenced above were materially false and misleading when made because they failed to disclose that: (1) Funko's profits and growth were not as positive as the Company represented; (2) Funko's business model and customer base had not insulated it from adverse industry, sales, and earnings trends; (3) as a result, Defendants' statements in the Registration Statement regarding Funko's business, operations and prospects were materially false and/or misleading.

**Subsequent Disclosures**

43.    On November 2, 2017, Funko's first public day of trading, its stock price opened at $8 and closed at $7.07, representing a 41% decrease from the $12 IPO price. Several news outlets reported this was due to risks associated with Funko's financial results and misleading accounting practices.

44.    On November 2, 2017, Bloomberg Gadfly published an article entitled, "Funko Extends Playtime to Its Accounting," stating the Company engaged in "fun-house accounting." The article stated, in relevant part:

> Funko, the purveyor of 2017's version of bobble-head dolls, appears to have a big head when it comes to its financial results.
>
> Shares of the company priced on Wednesday night at $12 and are scheduled to begin trading on Thursday morning. The pricing was below the indicated range of $14 to $16, but even that may have been too high.
>
> ***In Funko's IPO prospectus, in a chart with a big arrow pointing up, the company says that an important measure of its income, which it uses to determine the success of its operational strategies, rose by an average of 86 percent in its past two full years.*** The actual bottom line, though, was up an average of just 16 percent in 2015 and 2016 and has turned negative lately. Funko lost just more than $10 million in the first half of this year. ***How the toymaker gets a loss of $10 million to reflect back as an 86 percent earnings increase is the latest example of fun-house accounting on Wall Street.***



**Dress Up**

There'a a big difference between Funko's earnings and what it highlights as growing profits

Source: Funko corporate filings

Based on GAAP net income and Funko's reported "adjusted Ebitda."

Funko's main product, Pop! dolls, is hot. The plastic figures with enlarged heads cost about $10 each and are typically of popular characters from kids' movies or TV shows. But there are also Pop! figures based on athletes and characters from the popular HBO series "Game of Thrones." They have become fixtures at Gamestop and Barnes & Noble. (Full disclosure: My daughter's Pop! collection is nearing the entire population of Hogwarts, with Moana as a visiting student.) Sales of Pop! Dolls grew an impressive 34 percent last year.

**The question is how profitable the $10 figures are, if at all.** Funko arrives at its 86 percent compounded annual earnings growth rate by focusing on a figure that more and more companies point their shareholders to called adjusted Ebitda, which excludes a number of costs. Each company computes the figure slightly differently, which is why many accounting experts hate it, but companies like Funko say it is a better measure of their operations. Let's see.



**Party's Over**

Profits at toy maker Funko, even by its preferred measure, are slowing

Source: Corporate filings

2017 is through June 30. Adjusted Ebitda is as defined by Funko in its S-1 statement.

Funko says it had $97 million in adjusted Ebitda earnings in 2016, up from just $28 million in 2014, an increase of $69 million. How did it manage that increase? Two years ago, Funko was sold to a private equity firm. Funko says acquisitions are a one-time expense, even though it says it plans to do more deals in the future. Nonetheless, exclude those costs, and the company's adjusted Ebitda jumps nearly $25 million. ***Funko also contends it has intellectual property worth $250 million.*** That's odd for a company whose main products are based on others' intellectual property. Anyway, the company stepped up write-offs of that intellectual property last year***. Depreciation costs rose $19.5 million. But Funko says that cost is not part of its operations and excludes it from its adjusted Ebitda, causing that figure to rise once again.*** Funko has also piled on debt in the past two years, in part because of its private equity ownership. ***Interest expense rose $14.5 million, which is also excluded from adjusted Ebitda***. You get the picture; the higher cost is reflected back as better earnings once it's excluded.

***The result, just $7 million, or 10 percent, of Funko's $69 million increase in adjusted Ebitda -- which led to that 86 percent increase in growth from 2014 to 2016 -- was from actual earnings growth. The other 90 percent came from higher costs that the company says investors should just ignore. Funko Pop! dolls are based on fantasy. Its accounting shares a similar trait.***

(Emphasis added).

45.     On November 02, 2017, Yahoo Finance published an article entitled, "Shares of bobblehead maker Funko plummet after public debut," questioning the Company's readiness to go public. The article states, in relevant part:

Pop culture licensing company Funko (FNKO) went public on Thursday.

Funko began trading at $8 per share at 11:35 a.m. ET, 33% below the initial public offering price of $12, which was already reduced from the previously expected $14 to $16 range.

As of around 2:00 p.m. ET, shares traded in a range of $6.99 and $8.35.

The Everett, Washington-based bobblehead and plush doll manufacturer Funko decked out Times Square with a larger-than-life Ironman and Hulk to get the buzz going.

CEO Brian Mariotti was scheduled to do an interview with Yahoo Finance's live show, Midday Movers, but canceled a few minutes after trading started.

**Underlying trouble**
                                        * * *

*Funko has been a private company for the last 19 years and was sold to a private equity firm two years ago. It's disappointing opening Thursday perhaps confirms that it still wasn't ready for its public debut.*

(Emphasis added).

46.     On November 03, 2017, The New York Times published an article entitled, "How Not to Price an I.P.O.: A Couple of Lessons From This Week," stating it was "questionable whether selling giant-headed dolls of pop-culture figures is a sustainable business." The article states, in relevant part:

*Wall Street has just received a reminder that initial public offerings are not child's play. On Thursday, Goldman Sachs, JPMorgan Chase and Bank of America presided over a 41 percent drop in shares of Funko, the maker of pop-culture dolls, for the worst first-day showing in 17 years.* On the same day, Allena Pharmaceuticals, a company developing drugs for metabolic diseases, fell 29 percent. Faddish, highly leveraged and speculative firms can find a buyer — if bankers price them right first.

Trying to gauge investor demand for such companies can be difficult. The definition of what is considered risky tends to shrink as animal spirits rise, and vice versa. For example, there were no biotech I.P.O.s for a year and a half during the financial meltdown nearly a decade ago. Investors had no interest in companies without profit or revenue. That's not the case this year, with over 30 biotech offerings so far.

Bankers are well paid to find the right price. Companies don't want to mess up their public debut, so they tend to prefer the top Wall Street firms and can pay hefty fees.

*Funko is not the sort of firm that investors would clamor to buy when markets were weak. Its private-equity owner had extracted more than $100 million in cash from the firm since it went private in 2015, leaving its debt at over $200 million. Funko also lost money in the first six months of the year. A robust holiday season could produce a profit, but it is also questionable whether selling giant-headed dolls of pop-culture figures is a sustainable business.*

*The fact that bankers cut the amount of shares offered and reduced the price from the indicated range, yet the stock still suffered a vertiginous drop, could simply indicate they got demand wrong. Then again, the poor performance that both Funko and Allena suffered could signal something bigger: investors' receding appetite for risk.*

(Emphasis added).

47.     On December 19, 2017, BMO Capital Markets downgraded the Company's stock

and lowered the multiples used for its valuation.

48.    On December 21, 2017, Funko Class A common stock closed at $6.00 per share, representing a 50% decline from Funko's IPO price.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

49.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired the publicly traded securities of Funko pursuant and/or traceable to the Company's Registration Statement and Prospectus issued in connection with the Company's IPO and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which the officers and directors of the Company have or had a controlling interest.

50.    The members of the Class are so numerous that joinder of all members is impracticable. Since the IPO, the Company's securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

51.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

52.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

53.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a.    Whether Defendants' acts as alleged violated the federal securities laws;

b.      Whether Defendants' statements to the investing public in the Registration Statement and Prospectus misrepresented material facts about the financial condition, business, operations, and management of the Company; and

c.      To what extent members of the Class have sustained damages and what is the proper measure of damages.

54.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### COUNT I
### Violations of Section 11 of the Securities Act
### Against All Defendants

55.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

56.     This claim is brought by Plaintiff and on behalf of other members of the Class who purchased or otherwise acquired the Company's securities pursuant to or traceable to the Company's IPO. Each member of the Class acquired his, her, or its shares pursuant to and/or traceable to, and in reliance on, the Registration Statement and Prospectus. The Company is the issuer of the securities through the Prospectus and Registration Statement, on which the Individual Defendants were signatories.

57.     Defendants issued and disseminated, and caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements and/or omissions to the investing public that were contained in the Registration Statement and Prospectus, which misrepresented or failed to disclose, among other things, the facts as set forth above. By reason of the conduct alleged herein, each Defendant violated and/or controlled a person who violated Section 11 of the Securities Act, 15 U.S.C. §77k.

58.     The Company is the issuer of the securities sold via the Registration Statement and Prospectus. As issuer of these securities, the Company is strictly liable to Plaintiff and the Class members for the material misstatements and omissions contained therein.

59.     At the times they obtained their shares of the Company, Plaintiff and the members of the Class did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

60.     This claim is brought within one year after discovery of the untrue statements and omissions in and from the Registration Statement and Prospectus that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement and Prospectus. It is therefore timely.

61.     At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of the Company's securities was substantially lower than paid by Plaintiff and the other members of the Class.

62.     By reason of the foregoing, Plaintiff and the other members of the Class are entitled to damages as measured by the provisions of Section 11(e), 15 U.S.C. 77K(e), from the Defendants and each of them, jointly and severally.

**COUNT II**
**Violations of Section 12(a)(2) of the Securities Act**
**Against All Defendants**

63.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

64.     For purposes of this claim, Plaintiff expressly disclaims and excludes any allegations that can be construed as alleging fraud, recklessness or intentional misconduct as this cause of action is based expressly on claims of strict liability and/or negligence under the Securities Act.

65.     Defendants were sellers, offerors, underwriters and/or solicitors of sales of the Funko securities offering pursuant to the Registration Statement.

66.     The Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts. Defendants' actions of solicitation included participating in the preparation of the false and misleading Registration Statement.

67.     Plaintiff and other members of the Class purchased or otherwise acquired Funko securities pursuant to and traceable to the defective Prospectus. Plaintiff and other Class members did not know or in the exercise of reasonable diligence could not have known of the untruths and omissions in the Registration Statement.

68.     Defendants were obligated to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading. None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus were accurate and complete in all material respects. Had they done so, these Defendants could have known of the material misstatements and omissions alleged herein.

69.     By reason of the conduct alleged herein, these Defendants violated Section 12(a)(2) of the Securities Act. Accordingly, Plaintiffs and members of the Class who hold Funko securities purchased pursuant and/or traceable to the IPO have the right to rescind and recover the consideration paid for their securities and, hereby elect to rescind and tender their Funko securities to the Defendants sued herein. Plaintiff and Class members who have sold their Funko securities seek damages to the extent permitted by law.

### COUNT III
### Violations of Section 15 of the Securities Act
### Against the Individual Defendants

70.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

71.     This claim is asserted pursuant to Section 15 of the Securities Act against the Individual Defendants, each of whom was a control person of the Company at relevant times.

72.     The Individual Defendants were control persons of the Company by virtue of, *inter alia*, their positions as senior officers and/or directors of the Company, and they were in positions to control and did control, the false and misleading statements and omissions contained in the Prospectus and the Registration Statement.

73.     None of the Individual Defendants made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus and Registration Statement were accurate and complete in all material respects. Had they exercised reasonable care, they could have known of the material misstatements and omissions alleged herein.

74.     This claim was brought within one year after the discovery of the untrue statements and omissions in the Prospectus and Registration Statement and within three years after the Company's securities were sold to the Class in connection with the IPO. It is therefore timely.

75.     By reason of the above conduct, for which the Company's is primarily liable, as set forth above, the Individual Defendants are liable to Plaintiffs and the Class for damages suffered.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.     Determining that the instant action may be maintained as a class action under Federal Rule of Civil Procedure 23, and certifying Plaintiffs as Class Representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED this 4th day of June, 2018.

Respectfully submitted,

**HALL & GEORGE PLLC**

By:/s/ Colin M. George
Spencer Hall, WSBA No. 6162
E-mail:  shall@hallgeorge.com
Colin M. George, WSBA No. 45131
E-mail: cgeorge@hallgeorge.com
1001 Fourth Avenue, Suite 3900
Seattle, WA  98154
Telephone: (206) 292-5900
Facsimile: (206) 292-5901

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen (*pro hac vice forthcoming*)
(NY Bar No. 2255214)
Email: lrosen@rosenlegal.com
Phillip Kim (*pro hac vice forthcoming*)
(NY Bar No. 4145397)
Email: pkim@rosenlegal.com
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827

*Attorneys for Plaintiff*

# EXHIBIT 1

# Certification and Authorization of Named Plaintiff Pursuant to Federal Securities Laws

The individual or institution listed below (the "Plaintiff") authorizes and, upon execution of the accompanying retainer agreement by The Rosen Law Firm P.A., retains The Rosen Law Firm P.A. to file an action under the federal securities laws to recover damages and to seek other relief against Funko, Inc.. The Rosen Law Firm P.A. will prosecute the action on a contingent fee basis and will advance all costs and expenses. The Funko, Inc.. Retention Agreement provided to the Plaintiff is incorporated by reference, upon execution by The Rosen Law Firm P.A.

First name: satyanarayana

REDACTED

Middle initial:
Last name: kanugonda
Address:
City:
State:
Zip:
Country:
Facsimile:
Phone:
Email:



Plaintiff certifies that:

1. Plaintiff has reviewed the complaint and authorized its filing.
2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.
3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.
4. Plaintiff represents and warrants that he/she/it is fully authorized to enter into and execute this certification.
5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.
6. Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

Acquisitions:

| Type of Security | Buy Date | # of Shares | Price per Share |
|---|---|---|---|
| Common Stock | 11/03/2017 | 83 | 12 |

7. I have not served as a representative party on behalf of a class under the federal securities laws during the last three years, except if detailed below. [ ]

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate:                    YES

**Certification for satyanarayana kanugonda (cont.)**

By clicking on the button below, I intend to sign and execute
this agreement and retain the Rosen Law Firm, P.A. to
proceed on Plaintiff's behalf, on a contingent fee basis.          YES

Signed pursuant to California Civil Code Section 1633.1, et seq. - and the Uniform
Electronic Transactions Act as adopted by the various states and territories of the
United States.

Date of signing: 02/28/2018